May it please the court, my name is Mark Gregory Hall and I am appointed counsel for Mr. Jason Scott. Let me very briefly, just to sort of set the scene for this, describe the facts and circumstances of this case. This was a series of burglaries that occurred in Prince George's County, Maryland. In each case, allegedly Mr. Scott and another individual who was a co-conspirator went into houses, broke in, and upon breaking in would steal property and also would at gunpoint take car keys from the homeowners and steal their automobile. In the last of the burglaries that is mentioned, there is also a sexual assault of a teenage girl who was in the home at that time, as well as the perpetrator filming the young woman during the sexual molestation and taking still photographs of her. The reason that it is important, I believe, to briefly look at the facts in this case is because it directly leads to one of the issues that was raised, and that is the Dahlberg challenge that counsel below had made of an expert that was called by the government, Officer Stauffer. Officer Stauffer was a Prince George's County police officer and he was called, as quote, a burglary expert. When Mr. Scott was ultimately arrested in this case, he was arrested during the execution of a search warrant on a home he shared with his parents, and a number of items were seized during that search warrant. Amongst those items were bolt cutters, screwdrivers, multipurpose tool, pry tool, gloves, a black watch cap, and it's all laid out in Officer Stauffer's testimony. At the time of trial, counsel below raised a Dahlberg challenge to having Officer Stauffer testify as to the particular items which were seized, and being able to testify that these were burglary tools. Now, certainly having testimony from police officers as an expert witness is not unusual in criminal trials, and it very often comes about in the instances of, for example, a drug conspiracy case where you have a wiretap and you have words that are used that maybe aren't commonly used in some instances that a police officer is called or maybe an investigator is called to testify and say that when the parties on this phone call are using the word, let's just say tickets, I need 10 tickets, that that means on the basis of his investigation into the case, that that means 10 grams of heroin, let's say. Not an untypical thing that we see in US District Court all the time. In this case, though, I would suggest when you look at Rule 702 and you look at the non-exhaustive list that the Supreme Court laid out on Dahlberg, that you have trouble fitting what Officer Stauffer testified into that sort of scenario. For example, Officer Stauffer testified that what the use of gloves or flashlight or a pry tool would be. And I suggest to the court that these are not things that are subject to having an expert give an opinion of. What about computers and scanners? Well, I will agree that you could probably come up with some graduation of maybe some expert testimony was needed on one item but not on another. I would suggest to the court in the facts of this specific case, however, that there would be the computer has its obvious uses just like other things that are mentioned here. And that you could not necessarily say that a burglar is going to use a computer to keep track of the places he broke into and things that he took or what he got for selling them. Quite frankly, I always took that part of Officer Stauffer's testimony not to really be very intuitive. I have trouble imagining that a burglar would want to keep that type of a record. Mr. Hall, if it was unnecessary, why did trial counsel have to ask the detective what a spring loaded center punch tool was? That would be the one item out of this entire list that was testified to that- Well, then they needed an expert on that, didn't they? The problem is that if you had called the expert and you had him testify to this one particular item, it may have been instructive to the jury. But the officer, having been made an expert, testified to a whole plethora of things that were found. And the reason that is, I believe, troubling is because when you do that, you cloak those particular items with having had an expert give their stamp of approval to that this is definitely a burglar item. And quite frankly, I don't think you need an expert to- In isolation, standing alone, you could certainly argue to the jury that a pair of gloves or a screwdriver have many innocent purposes. But when you have someone like this draw them all together and show how collectively they can be used by a burglar, doesn't that have value to a jury? Doesn't that provide expertise that the average person wouldn't have? I would suggest not, because I believe that government's counsel could have just as easily argued those particular items to the jury in closing argument that what the court has just said. I think that that is something that is very fair argument by the government in closing. But again, as I said- So what you're telling us is that if the prosecutor, during final argument, held a screwdriver up and said, ladies and gentlemen, this is an item commonly used in burglaries in our community, you wouldn't eject? I'm not saying I wouldn't eject, Your Honor. What I am saying, though, is I believe that that, I will say that I believe that is proper argument. If Mr. Rosenstein, who tried the case, actually had taken that group of items and made the argument that the court made a moment ago that together as a group this has some implication that this person committed burglaries, I think that's a fair argument. Okay. If I may, unless the court has another question on this issue, I'd like to turn in my remaining minutes to next the search warrant issue that was raised, that was the first issue raised in the brief. As I indicated a few minutes ago, the government and the search warrant on a home in Prince George's County where Mr. Scott lived with his parents. And in doing the search warrant, the affidavit, which the magistrate judge based his decision on, considered largely the fact that this investigation had stemmed from a burglary at JC Arms, which is a gun shop in Carroll County. In that particular burglary, there was no one there, a large number of guns were taken. And this investigation had begun as a investigation into that burglary. It was a federally licensed gun store, and allegedly some guns had been sold. When the magistrate judge signed the search warrant, that is the information he had. Upon going into the residence, it appears that other things attracted the attention of the investigators. And I certainly can see that it's not at all unusual in some circumstances where you have a search warrant and something comes up and then you get a second search warrant to make sure it's covered. If I were advising the police, I would always advise better to get a second search warrant than just go on any other possible doctrine in order to take the property. The problem was is that in the subsequent search warrant application, there was no additional facts that were presented to the magistrate judge. The second affidavit, as I understand it, incorporated the first affidavit by reference. Yes. And the officer, the affiant, says that he observed items which he could identify as having come, has been the property taken in a burglary. What more probable cause do you need? I don't believe, what was taken in the second search warrant and what the affidavit spelled out were the computers, some items of clothing, things of that nature, which again, I dispute the computer burglary connection, but needless to say, I agree that there were, I would suggest, conclusory statements made in the second affidavit that didn't really give the magistrate judge enough information to make that leap, that these items were proper for seizure. Well, Mr. Hall, I'm positive that you're correct. Why wouldn't the good faith exception apply? What was it about this search warrant and affidavit that would lead a reasonably trained police officer to believe that it is facially defective? I would suggest it's because of the conclusory nature of what was in the affidavit and that I believe that had more been articulated that it could have been a proper search warrant. I don't believe enough was articulated to make it so. They can draw inferences based on their own experience in deciding whether or not there's probable cause, can't they? I believe that they can, however. I believe that when you're going back and preparing a second search warrant, you ought to put that in the search warrant application so that the judge has a proper basis for signing it. If I may, and I know I'm down to my last few minutes, but I did want to briefly touch on the third issue that was raised in the brief, and that was the question of the motion for mistrial that was made by trial counsel. And that concerns a particular line of evidence that came in concerning the defense's inability to test through their own expert. And they did, as the transcript makes clear, hire an expert to litigate and testify concerning computer equipment that was taken. The issue with that is this, and hopefully my lack of technical expertise doesn't fail me, but my understanding is that there were in the one burglary photographs and what would be considered child porn photographs taken of the young woman, video taken of the young woman. That information was on a digital camera that was in the home when the search warrant was executed. There was also a thumb drive, or however you want to describe it, that also had that information on it. What the defense did not have was the computer, because you can't take the thumb drive, plug it into at least the camera that was used in this case, and transfer the photographs. It has to go through a computer. And the reason that was important is because in going from the digital camera to the thumb drive, that computer, which was one of Mr. Scott's computers, would have been vital to have the defense use the same tool that the government used, it was called a FTK application, to see if that is also on the computer. And the reason that's important is because it was well known, and it was testified to, that the people who did these burglaries often traded things back and forth. You might have ended up with two computers and said, I can't sell one, do you want it? And in doing so, by not having the defense have the ability to test that computer, there was no ability to see if the pornographic film was actually on the computer. And- Now he stipulated that he got a copy of the report, so why didn't he follow up on that? I can't speak for counsel below, because I didn't try the case. I would only suggest that it's the government's obligation to give him the opportunity to have his expert, and they knew he had an expert, test that. I believe my time has expired. Thank you very much. Thank you. Mr. Rosenstein? Thank you, Your Honor, may it please the court, Rod Rosenstein for the United States. I'd like to begin with that issue that Mr. Hall just addressed, Your Honor, because it would be a matter of grave concern to me if we had withheld a computer from the defense in this case, but that is a complete misrepresentation of the record. This computer was among the evidence taken from the defendant's home, and inventory was provided to the defense. The defense had full access to all the evidence in this case. They chose not to examine the computer. They knew that the government had examined the computer, because the government provided to the defense prior to trial, prior to jury selection, well in advance of trial, we provided notice that we would have an expert testify, Mr. Brady, and he would testify about his forensic analysis of the computer. The only issue that arose during the trial was that there was one aspect of the evidence on the computer that the government had no intention to use, and that was that in the registry information of the computer, there was proof that the defendant had used that computer to transfer the photographs from the camera, from the disc inside the camera, to the thumb drive. That issue was of little or no significance to the government's case. The government had no intention to introduce it. It was solely incriminating evidence. The defendant acknowledged to the court that his expert was not going to do any analysis at all of the computer. That was a strategic decision made by counsel. The defendant's decision was that the only function of his expert would be to critique the government's expert. Didn't look at the evidence at all. He was free to do it. There was never any allegation that the underlying evidence was withheld. He chose not to do it. And then, Your Honor, if you look at the chronology of this case, the defense failed to provide their expert report as required by Rule 16. On the eve of the government concluding its case in chief on Friday, July 8th, the defendant, the government, raised this issue with the court and said, look, we're on the verge of closing our case. The defense is starting his case. He's calling an expert. We don't know what that expert's going to say because the defense has not complied with Rule 16. At that point, the defense said, well, our expert is going to critique the forensics of the government's expert. And one of the issues we're going to talk about is that there's no evidence of how these photographs were transferred from the camera to the thumb drive. At that point, the government said, well, in fact, we do have evidence to that effect. We weren't going to use it, but if that's an issue in the case, now we know that matters to you. Here's the report in advance of our expert testifying. We're going to add that to our expert's testimony. We're going to have him testify about that fact. That is the only issue that was disputed in the district court. And when was it disputed, Your Honors? Because the chronology is significant. The defense attorney initially, and I believe the opening brief of the appellant was mistaken on this because there was some confusion in the district court. The defense lawyer initially represented the court that he had never received this report, what's called an FTK report. Ultimately, however, he acknowledged that he had, in fact, received it before the expert testified. So he has the report. The expert testifies then on July 11, Stephen Brady. Defense counsel cross-examines him with the report, which he has. I assume there was no objection made prior to the witness testifying. None whatsoever, Your Honor, with regard to discovery. Two days later, the defense attorney comes into court and says, Your Honor, we're moving for a mistrial because the government didn't produce that report to us at all. The colloquy follows, which is reflected in the supplemental joint appendix. Defense counsel says, oh, that's right. I did have the report. I concede I had the report. The district court then says, look, there's really no issue here. You've forfeited any objection. You knew the expert was going to testify about the report. You didn't object to the discovery issue. You forfeited that. If you had raised it in a timely manner, the remedy would not have been mistrial. The remedy would have been a continuance. So you could do whatever it was you were going to do with regard to that report. But even today, Your Honor, more than a year, year and a half after the trial, almost two years after the trial, the defense still hasn't demonstrated anything that they would have done differently if they'd known this fact at an earlier time. So we submit, Your Honor, there was no discovery violation. There was no timely objection. A mistrial is not an appropriate remedy. And finally, there's no prejudice. It would have made no difference to the outcome of this case. And therefore, we submit there's just simply no issue whatsoever with regard to discovery. As a matter of fact, he confessed, didn't he? Pardon me, Your Honor? He confessed to the crime. He confessed. You know, this was a case, I'd like to say superb advocacy by the trial lawyers made the difference. But Your Honor, this is a case of overwhelming physical evidence, documentary evidence, testimonial evidence from accomplices, and the confession of the defendant. And he confessed, Your Honor, not only to these crimes, but he confessed that he committed 28 burglaries and nine home invasion robberies. And that's relevant with regard to the search warrant because when the police went into this house, they were looking, these were federal agents looking for evidence of the stolen guns. When they went into the house, what did they find? They found the defendant's bedroom and car were literally a warehouse, I should say figuratively, a warehouse for stolen property and burglary tools. They weren't expecting to find such a treasure trove. They didn't know he was such a big criminal as he turned out to be. And what did they do in an abundance of caution? They could have seized it all and then we could have defended it as being within the scope of the original warrant or subject to plain view. But in an abundance of caution, they called back to the assistant U.S. attorney and they said, let's get a supplemental warrant just to be safe here. So they took that evidence to the district court as Judge Hudson pointed out. It's not at all the case that there were no additional facts. What they said is here's what we knew before we went into the house, here's what we learned inside the house. Those are additional facts. And based upon that, the district court authorized, the magistrate judge authorized the warrant that resulted in the recovery of this evidence. So we respectfully submit that the defense is simply mistaken with regard to the representation that there was no additional information provided in that supplemental affidavit. There was and it speaks for itself. And finally, Your Honor, to briefly address the issue of the burglary tools, I believe counsel misspoke with regard to what the expert testified about. I understood him to say that there was expert testimony about from the burglary expert about a computer. That's not my recollection. The joint appendix at pages 544 to 553 reflects the entirety of this expert's testimony. It was a very brief few minutes in a multi-week trial. The expert testified about burglary tools, not about the computer. The computer was seized under the search warrant. But what he testified about was what would a burglary person who's an expert in police work in investigating burglaries and robberies, what inferences would they draw from this collection of items? And what are the unique uses? If I could interrupt you, Mr. Rosenstein, I don't think we can lay that at Mr. Hall's doorstep. I think I was the one who mistakenly asked him about the computer. Well, I'm not placing blame, Your Honor, but the advocates are always responsible for their answers in this courtroom. But I do think, Your Honor, that if you look at that record, it will demonstrate that the expert testified about things that have unique functions in burglaries and things that would not necessarily be known to the layperson. For example, there's a scanner, and when you turn it on, the frequency that comes up is the frequency of the Prince George's County Police. A layperson wouldn't know that. The expert knew that. He knew that this is, I didn't know this, but he knew that burglars, people who are in the business of burglaries, tend to monitor police communications so that they'll know if a police officer is responding. He explained how that could be used. And so, Your Honor, the other point the defense made, which I think is why this is somewhat of a bizarre objection is that my understanding of counsel's argument is essentially that no expert testimony is required because this is obvious, it would be obvious to a layperson, and it doesn't require expert testimony. And the problem for the defense, it's sort of a catch-22. What's the harm if the testimony given was obvious, undisputed, and he'd have no objection if counsel were to make those representations to the jury in closing argument? Just one final point with regard to that, Your Honor, and that is the standard of review for this court is abuse of discretion. The reason for that is that district courts are vested with discretion to evaluate the relevance and the reliability of testimony. In this case, Judge Bassetti evaluated it, made a determination it was relevant and reliable, and nothing that counsel's provided here gives this court any reason to conclude that the judge abused his discretion in making that determination. Counsel's not argued here the point that they harped on in their brief, which was the proposition that he needed to do scientific or technical analysis, and we submit it's quite clear that the reason you do scientific and technical analysis is if you're presenting scientific or technical testimony because the point of the case law of Kumho-Tyre and the other precedent that the Supreme Court has issued in looking at this issue is to protect the jury from testimony that may be unreliable and may be prejudicial because if an expert testifies, for example, that this chemical causes breast cancer, the jury would tend to believe that expert by virtue of his credentials and experience. That's not the issue here. All this expert said was something that offense stipulates is common knowledge, and therefore, there's no risk at all of the jury being misled and no error by the district court in concluding that this was relevant and reliable testimony. Thank you, Your Honor. Thank you. Mr. Hall, your rebuttal. Thank you. Let me, if I may, begin at the argument that Mr. Resentine ended with, which is the one concerning the Daubert challenge. The reason why I suggested to the court that it matters that in this case, someone was designated as an expert and testified that certain items were burglary tools is that having the added, if you will, credential of being an expert, I suggest elevates this to a higher level. When a juror who is a layperson, hears that this person who's testifying in front of us, he is an expert, I suggest that that is impressive, for lack of another word, to a juror, and that they take that sort of testimony as being true, maybe to a different sense than a juror would if it was another layperson testifying. And I suggest to the court, that's why that is important. Let me also address- Mr. Hall, is your objection to the admissibility of the evidence generally, or to the expertise of the detective? It is to the opinion of the detective that- Inadmissible because it is irrelevant under 702, or because he doesn't qualify as an expert. Which is it? I think it's because it's irrelevant. Okay. I don't think you need an expert for this. All right, fair enough. Now, let me speak briefly to the first issue that was raised by government's counsel, and that is the dispute that occurred in the district court between the government and Mr. Flowers, who tried the case below. It is, I would admit, a very confusing part of the transcript. There seems to have been, in reading it as a whole, a lot of back and forth between Mr. Rosenstein, Ms. Belf, who was co-counsel, and Mr. Flowers, who was defense counsel, as to who had what when. But in looking at the supplemental joint appendix that government's counsel referred to a moment ago, Mr. Flowers states, and it's on supplemental joint appendix page 96, Mr. Flowers says that Special Agent Brady had 12 reports. I've only received six of these reports. And then he goes on to talk about his expert who was there in court and was prepared to testify. I believe what Mr. Flowers was saying is that he needed to have his expert look at the reports. He didn't have them all. I realize that the government may have decided that they did not feel that they needed to add this particular bit of evidence concerning the forensic analysis of the computer. However, the issue, and I'm sure that government's counsel knows I have no reason to say that his office deliberately hid anything. But I think it is as was stated, they didn't intend to introduce it. But it was something that defense counsel below felt that it was necessary for him to have had. And- Why wasn't there a contemporaneous objection? Your Honor, excuse me. Why didn't he object to it? Did he testify? I believe that he did object to it. There was a very long colloquy regarding the motion that was made by Mr. Flowers that went between the court, Judge Mazzetti, and Mr. Flowers and the government concerning this particular piece of evidence. Was it not? That is correct. But that occurred two days later. The law requires it to be contemporaneous. I agree that the law requires it to be contemporaneous. However, I do believe the court can still look at it if the court finds that it's not harmless error. Fair enough. And, but as I said, I believe that Mr. Flowers felt that this is something he needed his expert to look at. And as Mr. Rosenstein said, there was, his understanding was that the expert, whose name I believe is Mr. Jones, was not going to testify as to that. We don't know what his testimony would have been or what Mr. Flowers may have chosen to make that testimony if he had had the FTK report that we believe he was entitled to. Thank you, Your Honor. All right, sir, thank you. We appreciate counsel's argument in this case, and most particularly yours, Mr. Hall. We recognize that you're court appointed and you've done a great service to the court by representing Mr. Scott today. Thank you very much. Thank you, Your Honor. I appreciate that.
judges: Barbara Milano Keenan, Henry F. Floyd, Henry E. Hudson